UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE/OPELOUSAS DIVISION

| | |
|---|---|
| **CHESTER JAMES REESE** | **CIVIL ACTION NO. 08-1423** |
| **VERSUS** | **JUDGE DOHERTY** |
| **MICHAEL ASTRUE, COMMISSIONER OF SOCIAL SECURITY** | **MAGISTRATE JUDGE HANNA** |

*REPORT AND RECOMMENDATION*

Before the court is an appeal of the Commissioner's finding of non-disability. Considering the administrative record, the briefs of the parties, and the applicable law, it is recommended that the Commissioner's decision be **REVERSED** and the case be **REMANDED** to the Commissioner for further administrative action.

*Background and the Commissioner's Findings*

Chester James Reese filed an application for disability insurance benefits on December 20, 2005, alleging a disability onset date of December 1, 2004. (R62, 63). He was born on September 26, 1943. (R291). He was 61 years old on his alleged disability onset date, and 64 on the date of the ALJ's Decision on May 30, 2008. (R291, 11). He had an eigth grade education but obtained a GED in 1979. (R17, 298). His past relevant work was as a security guard and insurance salesman. (R72, 17, 298).

In his application for disability, Reese alleged disability due to high blood pressure, diabetes, Bell's palsy, prostate cancer, back pain, heart disorder and irregular heat beat, and asthma. (R65). Claimant testified at the hearing on December 10, 2007.

There was no vocational expert testimony or medical expert testimony given.

In the Decision, the ALJ found Reese had not engaged in substantial gainful employment since December 1, 2004.  At the second step of the analysis, the ALJ found Reese had the following severe impairments: diabetes, degenerative disc disease of the lumbar spine, and Bell's palsy.  At the third step, the ALJ found Reese's impairments did not meet or equal any listed impairment.  The ALJ found Reese had the residual functional capacity to perform the full range of light work as defined in 20 CFR 404.1567(b).  The ALJ then found Reese able to perform his past relevant work as a security guard and as an insurance salesman at the fourth step of the analysis.  As a result, the ALJ determined Reese had not been under any disability, as defined in the Social Security Act, from December 1, 2004, through the date of the Decision on May 30, 2008. (R11 - 17).

## *Assignment of Errors*

After a complete reading of plaintiff's brief, it appears claimant asserts the following errors:

I.  The ALJ erred in failing to make a finding that claimant, as a person nearing retirement age, had highly marketable skills, in violation 20 C.F.R. 404.1563[1];

II. The ALJ's residual functional capacity was not supported by substantial evidence of record.

---

[1] The proper cite is 20 C.F.R. § 404.1568(d)(4).

## *Standard of Review*

The court's review is restricted under 42 U.S.C. §405(g) to two inquiries: (1) whether the Commissioner's decision is supported by substantial evidence in the record; and (2) whether the decision comports with relevant legal standards.  Carey v. Apfel, 230 F.3d 131, 136 (5th Cir. 2000); Anthony v. Sullivan, 954 F.2d 289, 292 (5th Cir.1992); Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994).  Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Carey, 230 F.3d at 136; Anthony, 954 F.2d at 292; Carrier v. Sullivan, 944 F.2d 243, 245 (5th Cir. 1991).  The court may not reweigh the evidence in the record, nor substitute its judgment for that of the Commissioner, even if the preponderance of the evidence does not support the Commissioner's conclusion.  Carey, 230 F.3d at 136; Johnson v. Bowen , 864 F.2d 340, 343 (5th Cir.1988).  A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings exist to support the decision. Johnson, 864 F.2d at 343.

Under the first four steps of the sequential analysis,[2] the burden lies with the

---

[2]  In determining whether a claimant is capable of performing substantial gainful activity, the Secretary uses a five-step sequential procedure set forth in 20 C.F.R. §404.1520(b)-(f) (1992):

1. If a person is engaged in substantial gainful activity, he will not be found disabled regardless of the medical findings.

2. A person who does not have a "severe impairment" will not be found to be disabled.

3. A person who meets the criteria in the list of impairments in Appendix 1 of the regulations will be considered disabled without consideration of vocational factors.

4. If a person can still perform his past work, he is not disabled.

3

claimant to prove disability. Leggett v. Chater, 67 F.3d 558, 564 (5th Cir. 1995). The inquiry terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. Id. Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant is capable of performing. Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994). This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other similar evidence. Fraga v. Bowen, 810 F.2d 1296, 1304 (5th Cir.1987). The burden of proof then returns to the claimant to rebut the Commissioner's showing. Masterson v. Barnhart, 309 F.3d 267, 272 (5th Cir.2002). A finding that a claimant is not disabled at any point in the five-step review is conclusive and terminates the analysis. Lovelace v. Bowen, 813 F.2d 55, 58 (5th Cir.1987).

## *Discussion*

**I.   Whether the ALJ committed legal error in failing to make a finding under 20 C.F.R. 404.1568(d)(4).**

The ALJ found Reese was able to perform his past relevant work as a security guard and insurance salesman, and thus Reese was found not disabled at the fourth step of the sequential analysis. The ALJ found Reese could perform the full range of light work:

---

5.   If a person's impairment prevents him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if other work can be performed.

lifting and carrying no more than 20 pounds occasionally and 10 pounds frequently, and standing and/or walking up to 6 hours in a workday, and the ALJ implicitly found Reese's former relevant work as security guard and insurance salesman fell into the light work category:

> In comparing the claimant's residual functional capacity with the physical and mental demands of these jobs [security guard and insurance salesman], the undersigned finds that the claimant is able to perform them as he actually performance [sic] them and as they are generally performed in the national economy. (R17).

20 C.F.R. § 404.1568(d)(4) reads in pertinent part as follows:

> If you are closely approaching retirement age (age 60–64) and you have a severe impairment(s) that limits you to no more than light work, we will find that you have skills that are transferable to skilled or semiskilled light work only if the light work is so similar to your previous work that you would need to make very little, if any, vocational adjustment in terms of tools, work processes, work settings, or the industry.

A review of the jurisprudence cited by claimant in brief and in the record shows 20 C.F.R. 404.1568(d)(4), is applicable only at the fifth step of the sequential analysis, where the Secretary must show the claimant can perform other work which exists in the national economy. See Smith v. Apfel, 154 F.Supp.2d 954 (W.D.Tex.2001); McQueen v. Apfel, 168 F.3d 152 (5th Cir. 1999); Preslar v. Secretary of Health and Human Services, 14 F.3 1107 (6th Cir. 1994)(R42). As noted above, the ALJ found Reese was able to perform his past relevant work at the fourth step. Thus, transferability of Reese's skills at the fifth step, where the burden is on the Commissioner to show claimant is able to perform work available in the economy, was not applicable, and the ALJ was not required to follow 20

5

C.F.R. 404.1563(d). Therefore, this assignment of error is without merit.

## II.  Whether the ALJ's residual functional capacity was supported by substantial evidence of record.

The ALJ found Reese was able to perform the full range of light work, and had severe impairments of diabetes, degenerative disk disease of the lumbar spine, and Bell's palsy. (R13). However, it appears that the effect of the impairments was analyzed separately rather than in combination when compared to the job duties of an insurance salesman who primarily was engaged in door to door work. (Cf. R312-315, 280-284). For example, Dr. Hamblin reported Reese had "end-organ dysfunction" in both lower extremities suggesting a diabetic neuropathy, i.e. substantiating the complaints of weakness and numbness in the lower extremities, and Bell's palsy which affected his speech. (R122-123) Dr. Foti reported that Reese had difficulty bending and squatting due to back pain. (R277). While each analyzed separately may suggest that Reese was capable of "light duty", viewed in combination there is not substantial evidence to find that he was able to perform the job duties of an insurance salesman, getting in and out of a car, walking door to door for hours at a time, four to five days a week, and talking with people in an effort to sell them an insurance product as he had done in the past.

Furthermore, Reese testified he suffered from incontinence following his prostate surgery in 2004, both urinary and fecal. (R310). Incontinence is a nonexertional impairment under the Social Security Act, and "must be considered by the Commissioner in determining whether a claimant is disabled." Crowley v. Apfel, 197 F.3d 194 (5th Cir.

1999). In the Decision, the ALJ discounted the credibility of Reese's incontinence complaints at the hearing, generally stating as follows:

> Of immediate concern is the lack of corroboration in the medical records for many of the claimant's complaints. When there is a significant difference between the claimant's testimony as to the nature, frequency and severity of his symptoms and the descriptions in the medical records, a question as to the credibility of the testimony is raised. (R15).

Specifically, the ALJ found Reese's complaints of incontinence incredible, stating as follows:

> The claimant reported incontinence of bladder and bowel at the hearing and the subsequent evaluation with Dr. Foti. However in a follow up visit for the prostate cancer in December 2004 with Dr. Rees, the claimant denied these problems. More importantly he admitted at the hearing that he could not remember if he ever reported these symptoms to Dr. Rees, his primary treating source for the prostate cancer. (R16).

Claimant testified that he was diagnosed with prostate cancer, and had surgery in New Orleans for same in 2004, he believed in February or July. (R300, 311, 312). Claimant's follow-up visits for the prostate cancer were also in New Orleans and the records of Dr. Rees reflect multiple appointments with a urologist in 2004 in New Orleans. (R219, 223, 224,312). Thus, claimant's primary treating source for the prostate cancer was the Medical Center of Louisiana - New Orleans, not Dr. Rees in Lafayette. Unfortunately, claimant's medical records from Medical Center of Louisiana - New Orleans were destroyed by Hurricane Katrina in September 2005, and were unrecoverable. (R198).

At the hearing, discussing his incontinence, claimant testified he didn't have good

control, and "[s]ome days it's worse than others of my stool and of my fluid." (R310). He testified he had to wear adult diapers after the surgery, but that "now I got a little bit better control" and that he was "wearing pads in the front and in the back." (R310). Claimant testified that since his medications had been increased recently, "it's hard for me to control my fluid or my stool," and that "I'll have to tell my doctor, since they keep giving me all that medicine. . . it's hard for me to control my fluid or my stool." (R310). On inquiry from the ALJ, the claimant testified as follows:

> Q. And this is – I'm going to find a record of that in the file?
>
> A. About the prostate cancer?
>
> Q. No, about incontinence.
>
> A. Well, I went –
>
> Q. Because sometimes people will tell the judge, but they've never talked to their doctor about it.
>
> A. – yeah, I know. Let me tell you this, Ma'am. I went to the Charity Hospital and I told them that I was (INAUDIBLE), you know, all that stuff, Ma'am. And you know what they did? They gave me a big old – a bunch of pads –
>
> Q. Um-hum.
>
> A. – and some pampers for men. Now, that was at the Charity –
>
> Q. Um-hum.
>
> A. – in New Orleans. (R311).

Claimant also testified that he went to New Orleans for his check-up visits after his prostate surgery, and "they got some kind of little program that they tell you what to do,

8

how to urinate. You got to exercise and that's kind of slows the fluid down." (R312).

On questioning by his attorney, claimant testified regarding his incontinence as follows:

> Q. And since you had that surgery, you just told the judge about the following problems, and that is with the incontinence.
>
> A. Yes.
>
> Q. You still have that problem today?
>
> A. Yeah.
>
> Q. Okay.
>
> A. Now I never did tell Dr. Reese [sic], or any of my doctors over here about that. (R317).

On questioning from the ALJ, Reese stated he couldn't remember whether he had told Dr. Rees in Lafayette about the incontinence problems, but that he had told the specialist in New Orleans, and "[A]nd what they did for my cure, they gave me some pads." (R318). Further questioning by the ALJ continued as follows:

> ALJ: Did you – you say that the doctors gave you some pampers or something like that, some kind of Depends, some kind of pads for incontinence. Did that help?
>
> CLMT: Well, I mean, it keeps your pants from getting too wet, you know.
>
> ALJ: And that's how you've been dealing with the problem?
>
> CLMT: Yeah.
>
> ALJ: Okay.
>
> CLMT: But sometimes I don't – (R321).

9

At this point, Mr. Reese was interrupted and did not get to explain further.

The December 2004, records of Dr. Rees at UMC - Lafayette, referenced by the ALJ and used to discredit claimant's complaints of incontinence, are mostly illegible. While they *appear* to read "No urinary urgency, hesitancy, nor incontinence" and "ED since prostatectomy," an appointment scheduled with the urologist in New Orleans for January 15, 2005, is noted in the exact same record. (R219)(Emphasis added). Appointments with a urologist are also documented in Dr. Rees' records for July and August 2004. (R219, 223,224).

The medical records show on June 14, 2004, at UMC-Lafayette, claimant complained to Dr. Marchand of hemorrhoids, erectile dysfunction, bleeding, and discomfort, (R224), and on November 2, 2005, following Hurricane Katrina, claimant complained to Dr. Rees, at UMC in Lafayette, that he was having rectal problems, including perianal itching and skin lesions. (R212).

On March 18, 2006, claimant was examined by Dr. Mark Hamblin, at the request of DDS. Dr. Hamblin noted claimant had "mild symptoms related to erectile dysfunction" and hemorrhoids, and did not suffer from dysuria or hematuria. However, Dr. Hamblin did not specifically address whether claimant suffered from any type of incontinence. (R119).

On September 3, 2007, claimant presented at UMC specifically for lower back pain and at that visit, he denied bowel or bladder incontinence. (R265) However, as

recognized by the ALJ, in the examination by Dr. Foti on February 2, 2008, following the hearing, Reese complained of incontinence.

The undersigned finds the ALJ improperly disregarded Reese's testimony that he suffered from incontinence. The ALJ found claimant incredible because he did not complain to Dr. Rees in Lafayette about his incontinence in December, 2004. However, Dr. Rees was not his treating physician for his prostate cancer and its sequela – his treating physicians specific to those issues were in New Orleans. In fact, the December 2004, chart note by Dr. Rees notes claimant had an appointment less than three weeks later, on January 15, 2005, at the New Orleans urology clinic.

According to Reese's testimony, he did complain to his New Orleans treating physicians about his incontinence. He was given adult diapers, and went through some type of urinary rehabilitation program, which he testified gave him better, but not complete, control.

Unfortunately, claimant's medical records for his prostate cancer surgery, and follow-up treatment by the urology clinic in New Orleans, were all destroyed in Hurricane Katrina.

While claimant did not specifically complain of incontinence in Lafayette prior to the hearing, he did complain of rectal problems, including itching and lesions, during various visits, and specifically complained to Dr. Foti after the hearing of incontinence.

During the hearing, Reese was not asked to explain his failure to tell his Lafayette physicians about his incontinence, and he offered no explanation. However, it is not

only plausible but quite reasonable that he discussed it with the "specialists" on multiple occasions who gave him no hope of being able to ameliorate the condition because when he reported the problem to the specialists, they simply supplied him with diapers. As he resignedly testified "anytime you have prostate cancer, you have to sign forms that it'll never be the same, you know." (R310).

While credibility determinations are the province of the ALJ, the Fifth Circuit has held that a credibility choice based upon a misinterpretation of medical records and erroneous factual information requires reversal and remand. See Olson v. Schweiker, 663 F.2d 593, 596 (5th Cir. 1981). Likewise, an ALJ's determination that a claimant's complaints are incredible, based on an absence of corroborating medical records documenting same, when those records have been destroyed through no fault of the claimant, cannot stand.

As described by Reese, his incontinence appears to be severe: that is, it has more than a minimal effect on his ability to work. See Stone v. Heckler, 752 F.2d 1099 (5th Cir. 1985). The failure to recognize Reese's incontinence as an impairment was not harmless error, as it may well have affected his residual functional capacity, which the ALJ assessed as including the full range of light work.

On remand, the ALJ should consider whether Reese's incontinence is severe under the standard of Stone v. Heckler, 752 F.2d 1099 (5th Cir. 1985), and throughout the sequential analysis, including it's effect, separately and in combination with Reese's other impairments, on his residual functional capacity. The ALJ should also consider

whether Reese is able to perform his past relevant work as a security guard and door to door insurance salesman, *as he actually performed this past work*.[3] If necessary, the ALJ should consider at the fifth step of the analysis Reese's ability to perform other gainful employment available in the national economy.

The undersigned notes no vocational expert was used at the first hearing, and although the ALJ herself stated in the hearing that "it could be that the best thing to do here would be to have a supplemental hearing with a vocational expert," no such hearing was held. (R321).

If the analysis proceeds to the fifth step on remand, a vocational expert should be used in light of claimant's non-exertional impairment of incontinence. See, e.g., Loza v. Apfel, 219 F.3d 378, 398-99 (5th Cir. 2000). The undersigned also notes claimant's first assignment of error becomes relevant at the fifth step.

### *Conclusion and Recommendation*

For the reasons given above,

**IT IS THE RECOMMENDATION** of the undersigned that the decision of the Commissioner be **REVERSED AND REMANDED** for consideration of claimant's incontinence, individually and in combination with his other impairments, throughout the sequential disability analysis.

Under the provisions of 28 U.S.C. Section 636(b)(1)(C) and Rule 72(b), parties

---

[3] The undersigned notes the insurance salesman job was not a desk job, but more in the nature of door to door collections of small policy premiums.

aggrieved by this recommendation have fourteen (14) days from receipt of this report and recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within fourteen (14) days after receipt of a copy of any objections or responses to the district judge at the time of filing.

**Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in this Report and Recommendation within fourteen (14) days following the date of receipt, or within the time frame authorized by Fed.R.Civ.P. 6(b), shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the District Court, except upon grounds of plain error. See <u>Douglass v. United Services Automobile Association</u>, 79 F.3d 1415 (5th Cir. 1996).**

Signed in Lafayette, Louisiana, this 13th day of January, 2010.

*[signature]*
Patrick J. Hanna
United States Magistrate Judge